<table>
<tr><td>UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF COLUMBIA</td><td>FILED</td></tr>
</table>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

DEC 1 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

DESIREE GREEN, )
          Plaintiff, )
v. )    Civil Action No. 03-2498 (PLF)
UNITED STATES POSTAL SERVICE, )
          Defendant. )

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a bench trial on June 15, 2005. The Court heard the testimony of the plaintiff, Desiree Green, and her husband, Timothy Reif. The Court also viewed the videotaped deposition of Dr. John Klimkiewicz, plaintiff's treating physician (see Exhibit 19), and has considered the 18 other joint exhibits proffered by the parties. The Court has reviewed the proposed findings of fact and conclusions of law filed separately by the parties and has read the cases on which they rely.

The following shall constitute the Court's Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., resulting from a collision between a United States Postal Service ("USPS") truck, then being driven by a USPS employee, and a bicycle that the plaintiff, Desiree Green, was riding.

2. Plaintiff Desiree Green was born on July 4, 1964. (See Trial Tr. at 37). On January 11, 2001, the day of the collision, she was 36 years old. Plaintiff and defendant agree that plaintiff's life expectancy is 79 years.

3. Plaintiff has a bachelor's degree and a master's degree. (See Trial Tr. at 37). She received her master's degree in public administration from the John F. Kennedy School of Government at Harvard University. (See id.).

4. On January 11, 2001, around noon, plaintiff Desiree Green was riding her bicycle in the 1800 block of H Street, N.W., Washington, D.C. (See Trial Tr. at 22-23). She was an employee of the World Bank, and was going from one World Bank building to another World Bank building. She was riding her bicycle in the crosswalk while crossing the street. (See id.).

5. While in the crosswalk on her bicycle, plaintiff was struck by a large USPS delivery truck. (See Trial Tr. at 22-24). The USPS truck was traveling the wrong way down H Street, N.W., which is a one-way street. (See id. at 22).

6. Defendant concedes that at the time of the collision the USPS employee, Earl Thomas Somerville, was acting within the scope of his employment.

7. When the USPS truck hit plaintiff's bicycle, plaintiff fell from her bicycle onto her wrist and right knee. (See Trial Tr. at 24); Police Report, dated January 11, 2001 (Exhibit 13). Plaintiff did not strike her head or lose consciousness. (See Trial Tr. at 24); Plaintiff's Depo. at 8 (Exhibit 18). She was bleeding from cuts and suffered from significant bruising. (See Trial Tr. at 26-27). Her clothes were torn. (See id. at 26). She was unable to apply any pressure to her right leg and was unable to walk. (See id.).

8. Plaintiff was taken by ambulance to the emergency room of Georgetown University Hospital, where she was treated for her injuries. (See Trial Tr. at 26-27); Plaintiff's Depo. at 9 (Exhibit 18). She was seen by Dr. Stadnyk and Dr. Foley. Plaintiff felt a lot of pain in her knee (see Trial Tr. at 26-27), but she did not break any bones and her wrist soon healed. See Plaintiff's Depo. at 10, 13 (Exhibit 18). Her right knee was placed in a brace to immobilize it, and she was given crutches. (See Trial Tr. at 26-27). Plaintiff was discharged from the emergency room that same day. It was recommended that plaintiff follow up with Dr. John

2

Klimkiewicz, an orthopedic surgeon and knee specialist at Georgetown University Hospital. <u>See</u> Plaintiff's Depo. at 9 (Exhibit 18).

9. Upon her discharge from the hospital, plaintiff was given prescription medication to alleviate pain from muscle spasms, which she took in the immediate aftermath of the accident. Plaintiff's muscle spasms went away within a month. (<u>See</u> Trial Tr. at 28, 64).

10. Plaintiff returned to work on the day after the accident. She suffered no lost wages. (<u>See</u> Trial Tr. at 52, 68).

11. Plaintiff saw Dr. Klimkiewicz one week after the accident, on January 18, 2001. She presented to him with pain, inability to walk without a significant limp, and swelling to her right knee. <u>See</u> Klimkiewicz Depo. at 8 (Exhibit 19). On that visit, plaintiff "rate[d] her pain on a scale of 1 to 10 as a 5." <u>Id</u>. Plaintiff described it as a "constant low grade pain." (Trial Tr. at 66). Upon initial examination, Dr. Klimkiewicz noted that plaintiff had limited motion in her right knee and that she lacked approximately 30 degrees of full extension. Dr. Klimkiewicz told plaintiff to obtain an MRI scan. <u>See</u> Klimkiewicz Report, dated January 18, 2001 (Exhibit 4).

12. Plaintiff returned to Dr. Klimkiewicz with the results of her MRI scan on January 20, 2001. Those results showed that plaintiff sustained a posterior cruciate ligament ("PCL") injury to her right knee, which Dr. Klimkiewicz considered a Grade II or partial tear. <u>See</u> Klimkiewicz Report, dated January 20, 2001 (Exhibit 4). There was no evidence of specific meniscal pathology and no evidence of an anterior cruciate ligament injury. Plaintiff told Dr. Klimkiewicz that her knee was "feeling much better" than it was a few days earlier.

13. Dr. Klimkiewicz gave plaintiff two options: surgery to replace the posterior cruciate ligament or an aggressive regimen of physical therapy. (<u>See</u> Trial Tr. at 27-28). Plaintiff chose aggressive physical therapy in the hope that she could overcome her injury without surgery. (<u>See id</u>.). Dr. Klimkiewicz also gave plaintiff a prescription for an ergonomic

chair to help alleviate pain related to the injury.  (See id. at 35); Klimkiewicz Report, dated January 20, 2001 (Exhibit 4).

14.   Plaintiff's physical therapy began with an initial evaluation on January 23, 2001.  At that time, she reported that her pain was a 4 or 5 on a scale of 1 to 10, see Sports Therapy and Rehabilitation, Inc. ("STAR") Notes (Exhibit 2), and that she was feeling better than she was a few days earlier.  (See Trial Tr. at 82-83).  After her first physical therapy session, plaintiff was able to gain full extension, with less pain.  (See id.).  On January 25, 2001, plaintiff told her physical therapist that she was satisfied with her progress.  (See id.).

15.   As a part of plaintiff's employment responsibilities at the World Bank, she was scheduled to travel to East Timor.  Dr. Klimkiewicz advised plaintiff that if she could perform physical therapy while in East Timor, she could go.  (See Trial Tr. at 28).

16.   Prior to leaving for East Timor, plaintiff told Dr. Klimkiewicz that her knee felt good, that she had no swelling, and that she was experiencing no instability.  (See Trial Tr. at 89).  She left for East Timor in February of 2001, while still on crutches.  See Plaintiff's Depo. at 17 (Exhibit 18).  She remained in East Timor for three to five weeks.  See id. at 22.  She went to physical therapy each morning while in East Timor.  (See Trial Tr. at 28-30).

17.   On April 25, 2001, after completing her trip to East Timor, plaintiff returned to Dr. Klimkiewicz for reevaluation.  Upon physical examination she showed no signs of effusion and her range of motion was excellent.  There was no evidence of joint line tenderness and no evidence of any posterolateral corner significant laxity at 80 or 90 degrees and no varus/valgus laxity at 0 or 30 degrees.  See Klimkiewicz Report, dated April 25, 2001 (Exhibit 4).  She was able to flex her knee, was walking without crutches, had no spasms, and reported pain at less than 5 on a scale of 1 to 10.  (See Trial Tr. at 88).  Dr. Klimkiewicz ordered her to continue physical therapy and return in six weeks.  See Klimkiewicz Report, dated April 25, 2001 (Exhibit 4).

18. On May 10, 2001, plaintiff told her physical therapist that her "knee feels great." She reported only occasional soreness in the back of the knee when sleeping on her stomach. See STAR Notes (Exhibit 2).

19. On June 4, 2001, plaintiff "went through a sports specific program without any complaints." STAR Notes (Exhibit 2). Plaintiff was discharged from physical therapy by STAR because: (1) "Patient had achieved recovery of pain-free functional mobility"; (2) "Patient had progressed to an independent strength training program for continued strengthening"; and (3) "Patient returned to pain (sic) athletic activities." The STAR physical therapist reported: "[Plaintiff]'s progression had been excellent. During rehabilitation, [Plaintiff] performed high-level agility and athletic drills without discomfort or pain." Discharge Summary from STAR to Dr. Klimkiewcz, dated June 11, 2001 (Exhibit 2).

20. After her discharge from physical therapy, plaintiff was able to do the prescribed exercises on her own at home. (See Trial Tr. at 31-34). Plaintiff purchased a stationary bike and exercise bands in order to exercise at home. (See id.). As of the date of the trial, June 15, 2005, plaintiff was continuing to do components of the prescribed physical therapy at home. (See id.). Plaintiff testified that she does 20 to 40 minutes of stretching as well as 20 minutes on the stationary bike four to five times a week. (See id. at 39). This is the same regimen she did while in physical therapy. (See id. at 40). Plaintiff acknowledged at trial that her recovery had "progressed significantly." (Id. at 80).

21. Plaintiff saw Dr. Klimkiewicz on June 5, 2001, the day after her discharge from physical therapy. Plaintiff told Dr. Klimkiewicz that her knee was feeling "fairly good," but said that there was some pain at times. Klimkiewicz Report, dated June 5, 2001 (Exhibit 4). There was no evidence of swelling or instability. See id.; (Trial Tr. at 89). On physical examination, Dr. Klimkiewicz found that: (1) there were no signs of effusion; (2) plaintiff's range of motion was systematic to the opposite side; and (3) there was no evidence of joint line tenderness. Dr. Klimkiewicz's notes indicate that plaintiff showed a Grade I to Grade II PCL

5

injury (Grade I being less severe).  Dr. Klimkiewicz requested that plaintiff return in three months for a follow up visit.  See Klimkiewicz Report, dated June 5, 2001 (Exhibit 4).

22.  Plaintiff did not return to Dr. Klimkiewicz until June 28, 2002 -- over one year later.  (See Trial Tr. at 98).  At that time, plaintiff said that her right knee was bothering her.  Upon physical examination, Dr. Klimkiewicz found that she had a full range of motion.  She had a Grade II posterior draw with minimal sag, and what appeared to be a Grade I posterolateral component, which did not seem to be significantly different from her previous exam.  Dr. Klimkiewicz instructed plaintiff to resume physical therapy and to follow up with him in six weeks.  See Klimkiewicz Report, dated June 28, 2002 (Exhibit 4).  Plaintiff resumed physical therapy with STAR in November of 2002.  (See Trial Tr. at 103).  Plaintiff did not return to Dr. Klimkiewicz until August 20, 2003, over a year later.

23.  During that year, on October 8, 2002, plaintiff signed a retainer agreement with the law firm of Koonz, McKenney, Johnson, DePaolis & Lightfoot, L.L.P.

24.  On December 17, 2002, plaintiff filed a Form 95, Claim for Damage, Injury, or Death, claiming $352,000.00 in damages.  See Form 95, dated December 17, 2002 (Exhibit 15).  Plaintiff acknowledged (on cross-examination at trial) that she had sought legal advice several months before she filed her claim, although she could not recall whether she sought advice before returning to see Dr. Klimkiewicz with new complaints of pain, on June 28, 2002, or thereafter.  (See Trial Tr. at 60-61, 151-53).

25.  When plaintiff visited Dr. Klimkiewiez on August 20, 2003, she was five-and-one-half months pregnant.  Upon physical examination, she demonstrated no evidence of any significant tenderness along the medial joint line, no lateral side tenderness, and vague tenderness localized along the medial and lateral retinacular region.  She had a Grade II PCL.  Dr. Klimkiewicz recommended that plaintiff continue hamstring and quadricep strengthening and that she return to see him following her pregnancy.  See Klimkiewicz Report, dated August 20, 2003 (Exhibit 4).

26. Plaintiff next saw Dr. Klimkiewicz eight months later, on April 28, 2004, complaining of pain localized to her knee and some feelings of instability. See Klimkiewicz Report, dated April 28, 2004 (Exhibit 4). She stated that she had pain while ascending and descending stairs. Dr. Klimkiewicz ordered x-rays of plaintiff's knee, but these showed no significant arthritic change. Based on plaintiff's having "report[ed] that the knee is [still] causing pain," Dr. Klimkiewicz recommended that plaintiff undergo PCL reconstructive surgery to address the pain. See Klimkiewicz Depo. at 14, 26-27 (Exhibit 11); Klimkiewicz Report, dated April 28, 2004 (Exhibit 4). Dr. Klimkiewicz testified that he recommended surgery in order to address plaintiff's subjective reports of pain. According to plaintiff, "the main complaint [to Dr. Klimkiewicz] was the instability" (Trial Tr. at 110), but, according to Dr. Klimkiewicz, "[i]t's not an instability issue here." Klimkiewicz Depo. at 14 (Exhibit 11).

27. On April 28, 2004, Dr. Klimkiewicz told plaintiff that, notwithstanding her knee injury, she could run a marathon "if you feel like you can." (Trial Tr. at 76); see Klimkiewicz Depo. at 19-20 (Exhibit 11). Dr. Klimkiewicz does not believe plaintiff is significantly limited from undertaking most athletic activities or activities of daily life. See Klimkiewicz Depo. at 19-20 (Exhibit 11). Nevertheless, plaintiff testified that she does not feel up to participating in many activities, including athletic activities, because the resultant pain is not worth it. (See Trial Tr. at 42).

28. Plaintiff testified at trial that she continues to have pain and that the pain has affected her everyday activities. (See Trial Tr. at 46). She said that she has a clicking in her right knee just with normal walking and instability in her knee when traveling downstairs or on a decline. (See id. at 42, 45, 86, 110). According to plaintiff, she must hold on to a railing when she goes down stairs. (See id. at 44-45, 128). Due to laxity in her PCL, she testified, the muscles around her PCL contract and cause her significant pain. (See id.). She also said that asymmetry in her gait caused by the knee injury also poses a challenge to full rehabilitation and causes pain. (See id. at 86-87, 136-38). According to plaintiff, Dr. Klimkiewicz has opined that the instability

7

in her knee is due to laxity in her injured PCL, and that the clicking is due to abnormal tracking of her right knee. (See id. at 29, 33, 47).

29.  Plaintiff is frustrated by the impact the injury has had on her daily life. (See Trial Tr. at 47, 134).  She testified that she regularly drives to places to which she used to walk, at times even driving to destinations one block from her home. (See id. at 47).  While sometimes she can walk pain-free, at other times, she said, there is pain associated with walking. (See id. at 134-35).  She said that carrying extra weight -- such as picking up her infant son -- is often painful due to the extra weight placed on her knee. (See id. at 42).  Even sitting for long periods of time -- at a desk, on an airplane or in the car -- sometimes causes tightness in the muscles surrounding the PCL and pain in her hamstring. (See id.).

30.  Plaintiff testified that she was always very athletic and that athletics were a major part of her life before the accident. (See Trial Tr. at 40, 46).  She had been a regular runner, an avid cyclist, and a hiker; she led a physically active life and participated in a wide range of athletic activities and races. (See id. at 40, 73).  These included participating in triathlons, one marathon (the Marine Corps Marathon), long distance swims, and running races, including 5-kilometer and 10-kilometer races, and the Army 10-miler. (See id. at 40, 68-69, 73).  According to plaintiff's husband, when she ran the Marine Corps Marathon, she ran side-by-side with her father, who is 30 years her senior. (See id. at 171-72).  She had every intention of following in her father's footsteps and continuing a tradition of participating in sports with her own children as she grew older, but feels that now she cannot do so. (See id. at 161-62).

31.  Since the accident, plaintiff has been able to swim, to hike, and to ride on a stationary bicycle. (See Trial Tr. at 43-44, 72).  Plaintiff believes she could run up to a mile, but, because of the pain she experiences, she no longer runs. (See id. at 75-76).[1]  Plaintiff is walking more, although she has tenseness or tightness in her hamstring; some days she can walk pain-

---

[1]      This testimony conflicts with that of Dr. Klimkiewicz, who testified that in his view she is not significantly limited from undertaking most athletic activities, including running.  See supra at 7, ¶ 27.

free. (See id. at 135). She considers herself better than she was in the immediate aftermath of the injury. (See id. at 42, 84, 134).

  32. Plaintiff did not have any muscle spasms in 2002 or 2003. (See Trial Tr. at 67-68). Her PCL has healed in part (see id. at 63), and plaintiff does not believe she has arthritis. (See id. at 86).

  33. Plaintiff has a permanent injury to her right knee. See Klimkiewicz Depo. at 20 (Exhibit 11). Due to the abnormal mechanics of her right knee and the stress the abnormalities assert on her knee, plaintiff's knee is more prone to increased wear and tear. See id. at 17-18. Plaintiff's right knee is more unstable than her left knee, and she has increased laxity in her right knee. See id. at 27. Dr. Klimkiewicz attributes plaintiff's symptoms to the increased laxity in her knee and to the resulting abnormal contact forces. See id. at 25.

  34. Plaintiff has continued to complain to Dr. Klimkiewicz of pain in her right knee. He believes that if the pain has persisted, plaintiff has plateaued in terms of conservative treatment. See Klimkiewicz Depo. at 10 (Exhibit 11). In her most recent exam with Dr. Klimkiewicz on April 28, 2004, he noted laxity in the knee that was asymmetric as compared to the opposite leg. See id. This was consistent with the initial MRI findings of a partial tear of the posterior cruciate ligament. See id. According to Dr. Klimkiewicz, individuals with partial tears often need surgery to relieve pain once conservative treatment has failed. See id. at 11. Since plaintiff told him physical therapy had not alleviated her pain, Dr. Klimkiewicz advised her that the only alternative is for her to have reconstructive surgery on her right knee. (See Trial Tr. at 47-48); Klimkiewicz Depo. at 11, 14 (Exhibit 11). Surgery should correct the problems with laxity and reduce the pain. See Klimkiewicz Depo. at 25 (Exhibit 11).

  35. At trial, plaintiff testified that she had opted not to have surgery at first, hoping that her situation would improve with therapy and exercise. (See Trial Tr. at 46-47). Plaintiff had hoped that with physical therapy she would have a 100% improvement, but she has only improved about 80%. (See id. at 170). She testified that surgery "is more appealing now"

because of the way her knee is tracking, because of abnormal contact positions within the knee, and because the pain she has is not getting better. (See id. at 46-48). She also testified that if she did not have significant pain she would not be so enthusiastic about having surgery because of the risks involved, the uncertainty of complete success, and the six to nine months of physical therapy that would follow. (See id. at 127). Plaintiff testified, "I do expect to have surgery" (id. at 48), and that she would do so "sooner rather than later." (Id. at 52; see also id. at 144-45). She testified that she will have the reconstructive surgery "if the current situation does not improve, and I don't know what I could do to improve it." (Id. at 144). She said she has determined that the prospect of living without pain outweighs the downside to the surgery. (See id. at 127).

36. If plaintiff chooses to undergo reconstructive surgery on her knee, Dr. Klimkiewicz will take out plaintiff's ligament and will replace it with grafted tissue. See Klimkiewicz Depo. at 13 (Exhibit 11). Over time, her body will incorporate the new ligament, and it will function like a natural posterior cruciate ligament. See id. The surgery would alleviate her pain by stabilizing her knee and restoring more normal function to the knee. See id. at 36.

37. If plaintiff opts for surgery, she will be on non-weightbearing crutches for four to six weeks after the surgery. Full recovery would require six to nine months. Even after surgery, her situation would be guarded and she would be at an increased risk for arthritis. See Klimkiewicz Depo. at 12, 15, 17, 22 (Exhibit 11).

38. Dr. Klimkiewicz told plaintiff that the cost of surgery to reconstruct her PCL tear, and follow-up physical therapy, would be between $15,000 and $20,000, "when everything is said and done." Klimkiewicz Depo. at 14-15 (Exhibit 11); (see Trial Tr. at 118). He testified that the surgery would be "a complete repair[.]" Klimkiewicz Depo. at 14 (Exhibit 11).

39. At the request of the USPS, on November 30, 2004, plaintiff was seen by Dr. Joel Fechter, who, like Dr. Klimkiewicz, is an orthopedic specialist. He conducted an

10

Independent Medical Examination ("IME") of plaintiff.  During the examination, plaintiff told Dr. Fechter the following:

> The patient notes that although she hurt her neck and left shoulder in the accident, these injuries resolved completely with therapy and treatment.  The patient notes that she still has some difficulties with intermittent pain in the right knee.  She feels that it gets red and somewhat warm with activities.  She notes that she has some sensations of instability and pain, especially with stair climbing most marked in the back of the knee.  She has no pain with straight walking.  She does not have a brace.  She has some clicking and notes some intermittent problems with swelling.

Dr. Fechter's Report of IME, dated November 30, 2004 (Exhibit 14).  Dr. Fechter confirmed the existence of a PCL injury, but he found "no tenderness to the knee" and its strength and mobility to be "full and painless."  Id.

40.  Dr. Fechter concluded that although Dr. Klimkiewicz's treatment for the right knee was fair, reasonable, and necessary, he did not agree that a PCL reconstruction was warranted.  He did not believe the condition of plaintiff's right knee would be improved by a PCL reconstruction.  Dr. Fechter instead recommended  "a continued exercise and strengthening program as well as a PCL brace" to see if plaintiff could be rendered more functional for her degree of laxity.  Dr. Fechter's Report of IME, dated November 30, 2004 (Exhibit 14).

41.  Dr. Fechter concluded that, "[i]n accordance with AMA Guidelines as well as taking into account pain, weakness, loss of endurance and loss of function, the patient is entitled to a 9% impairment of the right lower extremity."  Dr. Fechter's Report of IME, dated November 30, 2004 (Exhibit 14).

42.  Dr. Klimkiewicz testified that he agreed with Dr. Fechter's diagnosis, but disagrees with Dr. Fechter's view that surgery would not make plaintiff's knee more stable on a permanent basis.  See Klimkiewicz Depo. at 23-24 (Exhibit 11).  According to Dr. Klimkiewicz, plaintiff's persistent symptoms make surgery a reasonable treatment.  See id. at 21.  He believes the only other options would be activity modification or bracing, although he does not think

bracing is an appropriate treatment for plaintiff's injury. See id. at 21-22, 25. He recommends surgery.

43. Plaintiff's husband testified that plaintiff has been adversely impacted emotionally by her injury, and that it has had substantial effects on her life. (See Trial Tr. at 160). For instance, there have been times when she has called her husband in tears because she had just gone out walking with their son and had to return early because of pain in her right leg. (See id.).

44. Plaintiff claimed $2,000 in property damages on her Standard Form 95. See Form 95, dated December 17, 2002 (Exhibit 15). At trial, plaintiff testified that this amount was intended to reflect the value of her bicycle and the pantsuit she had been wearing at the time of the accident. (See Trial Tr. at 56). Plaintiff testified that the pantsuit cost between $500 and $1,000 when she purchased it new. (See id. at 105). She also testified that her pantsuit was worth $600 and that her bicycle was worth $700, for a total of $1,300. (See id. at 56); Plaintiff's Claim for Special Damages (Exhibit 17). She acknowledged that the bicycle was at least five years old, and that it was not worth the $700 she had claimed (which, she said, she based on the cost of a new bicycle). (See Trial Tr. at 57). Plaintiff acknowledged at trial that some of the components on her bicycle were over ten years old. (See id. at 108).

45. Plaintiff has claimed miscellaneous out-of-pocket expenses (taxi and parking receipts) of $60. (See Exhibits 12A, 12B, 17).

46. Plaintiff has claimed litigation costs and expenses of $5,105.34.

47. Plaintiff has claimed out-of-pocket costs for past medical expenses in the amount of $8,631.50, itemized as follows:

| | |
|---|---|
| Georgetown University Hospital | $ 692.00 |
| Sports Therapy and Rehabilitation, Inc. | $3,514.50 |
| Laking Therapy | $ 240.00 |
| John Klimkiewicz, M.D. | $ 540.00 |
| Sanctus Therapeutic Massage | $3,645.00 |
| Total: | $8,631.50 |

See Plaintiff's Claim for Special Damages (Exhibit 17).

48.  Plaintiff testified that the greatest out-of-pocket expense she has incurred thus far has been the costs of her therapeutic massage therapy.  Plaintiff testified that she went to the same massage therapist -- Sanctus Therapeutic Massage -- about six times a year before the accident, and that she has continued to go to the massage therapist since the accident.  (See Trial Tr. at 129).

49.  Plaintiff has claimed further medical expenses for future reconstructive knee surgery and follow-up physical therapy of $15,000 to $20,000.  See Plaintiff's Claim for Special Damages (Exhibit 17).

## II. CONCLUSIONS OF LAW

### A. Conclusions from the Facts Found

In a negligence action, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's damages.  See Beckford v. United States, 950 F. Supp. 4, 7 (D.D.C. 1997); Powell v. District of Columbia, 634 A.2d 403, 406 (D.C. 1993).  An employer, through the doctrine of respondeat superior, is vicariously liable for an employee's negligence if the employee was acting within the scope of his employment.  See Weinberg v. Johnson, 518 A.2d 985, 988 (D.C. 1986).  Under the Federal Tort Claims Act, the United States is liable for negligent acts caused by its employees when they are acting within the scope of their employment.  See 28 U.S.C. § 2672; Beckford v. United States, 950 F. Supp. at 7.

Earl Thomas Somerville, an employee of the defendant, owed a duty to plaintiff Desiree Green to exercise reasonable care in driving the postal truck. Defendant USPS admits that Mr. Somerville was acting within the scope of his employment.

Defendant breached the duty it owed to plaintiff by driving the wrong way down a one-way street; by failing to yield the right of way; by failing to keep a proper lookout; by failing

13

to pay full attention; by failing to avoid the collision; by failing to operate the postal truck in a reasonable, careful, and prudent manner; and by failing to adhere to applicable District of Columbia traffic and motor vehicle regulations.

As a direct and proximate result of defendant's negligence, plaintiff sustained physical injuries, including cuts and bruises, a tear of the posterior cruciate ligament on her right knee, increased laxity and instability in her right knee consistent with a tear in the PCL, injuries to the lower extremities, and wrist pain.

As a further direct and proximate result of defendant's negligence, plaintiff has some continuing pain in her right knee and the functionality of her right knee has been slightly compromised. She has trouble walking down stairs, walking down declines, and walking long distances. Her right knee is unstable and has increased laxity.

The unanimous medical testimony suggests that plaintiff is not in constant pain -- it is intermittent -- that she can walk short distances without difficulty, and that she can engage in most athletic activities and activities of her daily life, including swimming, hiking, and (despite her testimony to the contrary) running. The Court therefore concludes that PCL reconstructive surgery on plaintiff's knee is not required. Rather, any surgery would be elective.

### B. Out-of-Pocket Expenses

Compensatory damages in negligence cases are intended to "make the plaintiff whole," and the award of a particular amount of such damages may not be based on speculation but must be based on substantial evidence. Wood v. Day, 859 F.2d 1490, 1492-93 (D.C. Cir. 1988). In this case, plaintiff seeks damages in the amount of $8,631.50 for out-of-pocket medical expenses; $1,300 for property damage to her bicycle and pantsuit; $60 for miscellaneous expenses (taxi and parking receipts); and $5,105.34 for litigation costs and expenses.

Under settled District of Columbia law, a "plaintiff's damages [for past medical expenses] should include the value of all reasonably necessary medical and hospital services furnished" to the plaintiff. Albano v. Yee, 219 A.2d 567, 568 (D.C. 1966); see also

14

STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Instruction 13.3

(June 2008) ("If you determine that [the plaintiff] is entitled to a damage award for medical

expenses incurred, then you should consider the reasonable value of all medical services given to

the plaintiff.").[2] Defendant does not dispute plaintiff's right to damages in the amount of her

legitimate out-of-pocket costs for past medical expenses. Specifically, defendant does not

dispute the reasonableness of the following amounts claimed on Exhibit 17: $692 to Georgetown

University Hospital (see Exhibit 6); $540 to Dr. John Klimkiewicz (see Exhibit 9); $3,514.50 to

Sports Therapy and Rehabilitation, Inc. (see Exhibit 7); and $240 to Laking Therapy Services,

L.L.C. (see Exhibits 3, 8), for a total of $4,986.50.

     As part of her past medical expenses, plaintiff has also submitted bills for

massage therapy from Sanctus Therapeutic Massage in the amount of $3,645. (See Exhibit 10).

This includes the cost of twelve massage sessions in 2001, but plaintiff admits that she likely

would have gone to six massage sessions even if she had suffered no injury. Because the

defendant should not be required to pay for costs that plaintiff would have incurred even without

the injury caused by defendant, the cost of six of the $81 sessions, or $486, will be deducted from

the out-of-pocket medical expenses for massage therapy plaintiff claimed for 2001. Similarly,

six of the $99 massage sessions, or $594, will be deducted from the out-of-pocket medical

expenses plaintiff claimed for massage therapy in 2002, and six of the $99 sessions, or $594, will

be deducted from the out-of-pocket medical expenses plaintiff claimed for massage therapy in

2003. (See Exhibit 10). The Court therefore will deduct $1,674 from the $3,645 that plaintiff

claims as her past medical expenses for massage therapy, reducing that amount to $1,971. With

that reduction, plaintiff is entitled to damages for out-of-pocket expenses for past medical care in

---

[2]    In the District of Columbia, a plaintiff may establish the reasonableness of her past medical expenses "by proving the professional services rendered and the amount of the bill paid or incurred." Nunan v. Timberlake, 85 F.2d 407, 410 (D.C. Cir. 1936). In other words, a plaintiff generally need not provide additional evidence of the "reasonableness" of her expenses. See Albano v. Yee, 219 A.2d at 568 ("[I]t [is] proper to admit in evidence medical bills incurred by [the plaintiff] in the absence of testimony, other than hers, that the bills [are] reasonable and necessary.") (citing Giant Food Stores, Inc. v. Bowling, 202 A.2d 783, 784 (D.C. 1964)).

the amount of $6,957.50, rather than the $8,637 she claims.  See Plaintiff's Claim for Special Damages (Exhibit 17).

Plaintiff now claims property damage in the amount of $1,300, for damage to her bicycle which, when new, was worth $700, and a pantsuit worth approximately $600.  Plaintiff testified that the bike was at least five years old -- and quite probably older -- and acknowledged that some of the bike's components appeared to be at least ten years old.  Plaintiff introduced no evidence of the actual value of the bicycle at the time of the accident.  "Damages may not be based on mere speculation or guesswork."  Romer v. District of Columbia, 449 A.2d 1097, 1100 (D.C. 1982).  Accordingly, plaintiff will be awarded property damages in the amount of $800 -- a fair estimate of the value of the pantsuit and the bicycle at the time of the accident.  Plaintiff will also be awarded $60 for miscellaneous out-of-pocket expenses.  (See Exhibits 12A, 12B, 17).

Plaintiff has proffered that her litigation costs and expenses were $5,105.34. Although there was no evidence elicited at trial as to these costs, these charges appear to be reasonable and defendant disputes neither their accuracy nor their reasonableness.  On the record before it, however, the Court cannot determine an amount plaintiff (or her counsel) should be awarded for attorneys' fees.

Based on the foregoing, plaintiff will be awarded out-of-pocket costs of $12,922.84.

### C.  Future Medical Expenses

The estimated cost of the optional reconstructive knee surgery and follow-up physical therapy that plaintiff has said she will undergo is $15,000 to $20,000.  Over four years after her last discussion with Dr. Klimkiewicz about surgery, and three-and-one-half years after she testified before this Court that she intended to have surgery "sooner rather than later," plaintiff has not had reconstructive surgery on her knee.[3]

---

[3]    Plaintiff last discussed surgery with Dr. Klimkiewicz on April 28, 2004.  She testified before this Court on June 15, 2005.  None of the supplemental filings submitted by the parties to

Recovery of future damages is available only if such consequences are "reasonably certain" to occur. Wilson v. Johns-Manville Sales Corp., 684 F.2d 111, 119 (D.C. Cir. 1992). The burden is on the plaintiff to prove that it is "more likely than not" that the projected consequence giving rise to future damages will occur. Id.; see also Moattar v. Foxhall Surgical Assocs., 694 A.2d 435, 439 (D.C. 1997). In the District of Columbia, the "reasonably certain" to occur/"more likely than not" standard means "a greater than 50% chance." Moattar v. Foxhall Surgical Assocs., 694 A.2d at 439. As the D.C. Circuit has said: "[I]f the proof does not establish a greater than 50% chance, the injured party's award must be limited to damages for harm already manifest." Wilson v. Johns-Manville, 684 F.2d at 119; see also Wood v. Day, 859 F.3d at 1493.

Thus, an award of damages for future medical expenses is speculative and hence inappropriate when a plaintiff claims that she will incur future medical expenses by following a recommended course of action, but other evidence suggests that she will *not* follow the recommended course of action and therefore will *not* incur the future medical expenses. See Moattar v. Foxhall Surgical Assocs., 694 A.2d at 439 (damages for future medical expenses may not be awarded unless there is nonspeculative evidence demonstrating to a reasonable certainty -- that is, a greater than 50% chance -- that future medical expenses will be incurred); District of Columbia v. Howell, 607 A.2d 501, 507 (D.C. 1992) (award of damages for future medical expenses overturned where "the likelihood that the . . .[injured party] would actually incur those expenses rested on a highly speculative foundation," given the intermittent attendance by the injured party at prior treatment sessions); General Elec. Co., Inc. v. Taalohimoineddin, 579 A.2d 729, 732-734 (D.C. 1990) (rejecting damage award providing for cost of plaintiff's future surgery as being too speculative because "there was no evidence that any future surgery was either necessary or likely to be performed"); Romer v. District of Columbia, 449 A.2d at 1100 n.4 (upholding denial of award for future medical expenses; noting that any award based on future

_____

the Court since June 15, 2005 have stated that plaintiff has had the surgery.

17

medical expenses would be speculative because "[plaintiff] refused earlier recommendations of his physicians, [and therefore] might also refuse to undergo future treatments").

In this case, plaintiff seeks $15,000 to $20,000 in damages for future medical treatment that will be incurred only if she decides to undergo optional reconstructive surgery. The only evidence that she will undergo this surgery is her testimony. Plaintiff testified at trial that rather than continue to endure pain she expects to undergo reconstructive knee surgery "sooner rather than later." But plaintiff's actions to date belie her testimony. On several occasions, after complaining of pain, plaintiff did not follow Dr. Klimkiewicz's directions to return in a couple of weeks. Instead, on two occasions she failed to appear for over a year. Moreover, even after plaintiff's most recent complaint to Dr. Klimkiewicz (on April 28, 2004) of pain in her right knee -- the complaint which prompted Dr. Klimkiewicz to recommend reconstructive surgery -- she failed to undergo surgery. Given the passage of time since plaintiff's last discussion with Dr. Klimkiewicz about the probability of surgery and the fact that plaintiff has not undergone surgery even three-and-one-half years after the trial in this case, the fair inference is that such surgery is not "reasonably certain" to occur -- sooner, later, or ever. An award of damages for future medical expenses therefore is not warranted.

### D. Pain and Suffering

Pain and suffering necessarily are subjective; only the person experiencing them can know how severe they are. Trying to quantify pain and suffering and to put a dollar figure on the amount of damages to be awarded is extremely difficult. As Judge Joyce Hens Green aptly put it:

> The nature of pain and suffering is such that no legal yardstick can be fashioned to measure accurately reasonable compensation for it. No one can measure another's pain and suffering; only the person suffering knows how much he is suffering, and even he could not accurately say what would be reasonable compensation for it. Earning power and dollars are interchangeable; suffering and dollars are not. Two persons apparently suffering the same pain from the same kind of injury might in fact be suffering respectively pains differing much in acuteness, depending on the nervous

> sensibility of the sufferer.  Two persons suffering exactly the same
> pain would doubtless differ as to what reasonable compensation for
> that pain would be.  This being true, it follows that jurors [and
> judges] would probably differ widely as to what is reasonable
> compensation for another's pain and suffering . . .

Nelson v. United States, 633 F. Supp. 1263, 1270 (D.D.C. 1986).

The plaintiff in this case suffered a partially torn posterior cruciate ligament.

Plaintiff's own doctor testified that this injury does not significantly limit plaintiff's ability to

engage in her daily living activities and in many athletic activities.  The evidence established that

in the immediate aftermath of the injury plaintiff reported pain at a level of 5 on a scale of 1 to

10, and that this pain subsided within days.  Before she was discharged from physical therapy,

plaintiff was performing exercises pain-free.  The spasms that plaintiff testified occurred several

times after the injury also stopped within several months.  Neither plaintiff's injury, nor the pain

associated with it, ever caused her to miss a day of work.  Plaintiff testified at trial that her knee

pain is so bad now that she "just ha[s] trouble walking around the block some days." (Trial Tr. at

41).  This testimony is inconsistent with plaintiff's deposition testimony, the testimony of Dr.

Klimkiewicz, and Dr. Fechter's IME report.  The Court does not credit plaintiff's trial testimony

on this issue.

Plaintiff filed this lawsuit in December 2003.  In April 2004, plaintiff reported to

Dr. Klimkiewicz that she had pain localized to her knee, particularly while ascending and

descending stairs.  She told Dr. Fechter in November 2004 that she has "intermittent pain" in the

right knee and "some sensations of instability."  While Dr. Klimkiewicz does not believe she is

significantly limited in most daily activities and many athletic ones and that instability is not a

significant issue, he recommended surgery because plaintiff reported that the knee was still

causing her pain.  Nevertheless, for almost seven years after the injury, and over four years since

Dr. Klimkiewicz recommended surgery as an option, plaintiff has elected not to undergo the

surgery that her own doctor told her will relieve any pain about which she complains.

19

Plaintiff seeks an award of $342,000 for emotional and physical pain and suffering. Even if one applies a tripling equation based on plaintiff's past medical expenses, however, as some of the cases the parties have brought to the Court's attention suggest,[4] this calculation would support a pain and suffering award of closer to $20,000. Because plaintiff clearly suffered pain as a result of the injuries caused by the defendant -- at first at a level 5 on a scale of 1 to 10, and now intermittent pain, but not pain serious enough for her to choose surgery over living with the pain that may continue at some tolerable level for years -- the Court thinks it fair to award plaintiff damages for pain and suffering in the amount of $50,000.

## III. CONCLUSION

Under the circumstances of this case, the Court concludes that plaintiff is entitled to an award of (1) compensatory damages for past medical expenses, property damage costs, and litigation costs and expenses in the amount of $12,922.84; (2) no damages for future medical expenses; and (3) an award of damages for pain and suffering in the amount of $50,000, for a total of $62,922.84. Judgment will be entered accordingly. The Clerk of this Court is directed to enter judgment in plaintiff's favor in the amount of $62,922.84.

DATE: 12|17|08

PAUL L. FRIEDMAN
United States District Judge

---

[4]    See, e.g., Haahr v. Mourlas, No. 0411-11295, 2005 WL 2596414 (Or. Cir. Ct. June 22, 2005); Hooper v. The Sherwin Williams Co., No. 02-08-CA, 2004 WL 3236541 (Fla. Cir. Ct. Aug. 20, 2004); Fobbs v. Bowlding, No. CAL03-16613, 2004 WL 3528413 (Md. Cir. Ct. Oct. 20, 2004); Polsen v. Ceccolini, No. 18499/01, 2004 WL 3093872 (N.Y. Sup. Ct. Sept. 21, 2004); McGregor v. Just Temps, Inc., No. 24-C-03005374, 2004 WL 3363760 (Md. Cir. Ct. Sept. 1, 2004); Radford v. Becker, No. 2002-CV-4157, 2004 WL 741338 (Ohio Com. Pl. Jan. 1, 2004); Appellaniz v. City University of New York, No. 104962/97 (N.Y. Sup. Ct. May 5, 2003); Shackleford v. Mega Enterprise, Co., No. SCVSS-64227, 2002 WL 32108580 (Cal. Sup. Ct. Sept. 20, 2002); Rivera v. Marek, No. 01-CV-002987, 2001 WL 1839633 (Wis. Cir. Ct. April 2001); Beckford v. United States, 950 F. Supp. 4 (D.D.C. 1997); Holland v. Harris, No. BC-091324, 1996 WL 153407 (Cal. Sup. Ct. Jan. 24, 1996). There are a number of cases cited by plaintiff and not cited herein because the Court has found them not to be analogous.